# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. BOBBY JOE CROOM

**Direct Appeal from the Circuit Court for Madison County**
**No. 10-65      Roy B. Morgan, Jr., Judge**

---

**No. W2011-00461-CCA-R3-CD  - Filed May 10, 2012**

---

The defendant, Bobby Joe Croom, was convicted by a Madison County Circuit Court jury of three counts of rape of a child, a Class A felony, and three counts of aggravated sexual battery, a Class B felony.  He was sentenced to an effective term of fifty years in the Department of Correction.  On appeal, he argues that the trial court erred in not requiring the State to elect the particular instances of rape and sexual battery it was relying on for conviction and that the evidence is insufficient to sustain his convictions.  After review, we reverse and remand in part, and reverse and dismiss in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded in Part, Reversed and Dismissed in Part**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Darlene Rebowe, Franklin, Tennessee (on appeal); and Susan B. Korsnes, Assistant Public Defender, Jackson, Tennessee (at trial), for the appellant, Bobby Joe Croom.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's alleged sexual interactions with his girlfriend's eight-year-old daughter during a three-week period in July 2009.  As a result, the defendant was indicted for three counts of rape of a child and three counts of aggravated sexual battery

– one rape of a child and one aggravated sexual battery occurring in each time period of July 1-4, July 5-11, and July 12-18.

## State's Proof

At trial, the victim testified that she was presently nine years old and had been eight in July 2009. Through a series of questions, the victim demonstrated that she knew the difference between the truth and a lie and that one gets in trouble for telling a lie but not for telling the truth. Also, through a series of questions and a diagram of a naked boy and girl, the victim testified that both boys and girls have private parts. She described a girl's private part on her chest as "[b]oobs," a girl's private part between her legs as her "middle part," and private area on her backside as "butt." She further described a boy's private part between his legs as his "middle part."

The victim testified that, the previous summer, she lived in Jackson with her mother, her brothers, ages eleven and six, and the defendant, whom she referred to as "Tyson." The victim explained that her mother and the defendant shared a bedroom, her two brothers shared a bedroom, and she had her own bedroom. She said that her mother presently worked at a McDonald's restaurant and had worked there the previous summer as well.

The victim testified that the defendant had done something to her that made her feel bad and that the actions took place during the day or the nighttime when her mother was at work. The defendant took her into his bedroom, removed their clothes, and "put his middle part in [her] middle part." The victim illustrated that the defendant had her lean back with her arms and legs spread open, while he was on his knees in a thrusting motion. She said that the defendant did this to her "[a] lot," but she did not know if it happened every day. The victim stated that it hurt when the defendant put his "middle part" in her "middle part."

The victim testified that the defendant also used his mouth to "lick[] [her] middle part." The defendant undressed her and spread her arms and legs open, while the defendant lay on his stomach propped up on his elbows. She said that the act occurred in her mother's room when her mother was at work. She recalled that it happened "[a] lot[,]" but she did not know if it happened every day.

The victim testified that the defendant "put his middle part in [her] butt." He also rubbed her middle part back and forth with the palm of his hand. She recalled that the defendant also "sp[a]t on [her] middle part." The victim stated that she had observed the defendant's "middle part" and that, when the defendant touched her, he said, "Ain't this the best you ever had?"

The victim testified that she was seven years old when the abuse started and eight years old when she reported the abuse. The victim told her uncle, her grandmother, and then her mother. After she reported the incidents, she was examined by a doctor.

The victim's grandmother testified that the victim was staying with her the week of July 23, 2009, when the victim disclosed to her that the defendant "had been messing with her." She immediately called her daughter, the victim's mother, and called the police the following day.

The victim's mother testified that, in July 2009, she lived with the victim, her two sons, and the defendant. She confirmed that she and the defendant shared a bedroom, the boys shared a bedroom, and the victim had her own room. She said that the defendant had been living with her for almost two years at that time.

The victim's mother testified that she worked at McDonald's the entire two-year period the defendant lived with her and continued to work there about forty hours a week. She said that her work shift varied. In July 2009, her shifts the first week were as follows: she was off on July 1 and worked 7:00 a.m. to 2:30 p.m. on July 2, 3, and 4. Her shifts the second week were as follows: she was off on July 5, worked 5:00 p.m. to 1:00 a.m. on July 6, 7, and 8, worked 9:00 a.m. to 3:00 p.m. on July 9, worked 7:00 a.m. to 2:00 p.m. on July 10, and was off on July 11. Her shifts the third week were as follows: she was off on July 12, worked 4:00 p.m. to 1:00 a.m. on July 13, was off July 14, and worked 7:00 a.m. to 2:00 p.m. on July 15, 16, 17, and 18. When she was at work, the victim was either at school or at home with the defendant, as the defendant was the babysitter for the summer. She recalled that the victim stayed with her grandmother, the witness's mother, the week of July 19.

The victim's mother testified that she learned, on July 23, 2009, that the defendant "had been fondling with [the victim]." She was "scared, nervous[,] [and] confused" when she heard the news. She confronted the defendant, and he "never denied it. He never really said anything." Instead, he moved out. She called the police the following day.

She testified that she attended the preliminary hearing and heard the victim testify that the defendant had said, "Ain't this the best you ever had?" to her. Afterwards, she received a letter from the defendant in which the defendant wrote, "And who told her to say, 'Ain't this the best you ever had?' Bitch, I told you that shit."

Danielle Jones, an investigator with the Jackson Police Department, testified that she became involved in the investigation of this case on July 24, 2009. She called the defendant the next day to talk with him about the sexual allegations made by the victim. The defendant

did not deny the allegations and informed Investigator Jones that he was out of town and would "get back with [her] later on that evening." The defendant never called her back, and he was taken into custody approximately a month after Investigator Jones had called him.

Dr. Lisa Piercy, a pediatrician, testified that she had performed examinations on approximately 300 children who were suspected victims of sexual abuse. Dr. Piercy interviewed and examined the victim on July 24, 2009. She explained that she was the only one present during the interview of the victim and that she received no information about the alleged abuse so that she did not lead the victim or focus on the wrong thing during the interview.

Dr. Piercy testified that she asked the victim if anything bad had happened to her, and the victim told her that her mother's boyfriend had been giving her a "bad touch." When she asked the victim when the last "bad touch" had occurred, the victim said, "[A] few days ago." Dr. Piercy explained that the victim's response was appropriate for her age in that elementary school aged children often have problems with concepts of time and will recall "big occasions" like birthdays and holidays but not "last week" or certain dates.

Dr. Piercy testified that the victim told her that the defendant "would feel on [her] middle part with his hands on the inside, and it hurt. He put his mouth on [her] middle part, and then he would put his middle part in [her] middle part, and it hurt. . . . He put his fingers in [her] butt." The victim told her that, during the incidents, the defendant would tell her that she "was the best he ever had." The victim indicated that the same things happened every time.

Dr. Piercy testified that she then conducted the physical examination of the victim and described the examination of the victim's vagina as "very markedly abnormal." Dr. Piercy elaborated that the bottom half of the victim's hymenal tissue was missing, which was consistent with the victim's report of repeated penile and digital penetration. She did not observe any lacerations or abrasions but explained that is normal where the abuse is repeated and the body has time to adapt to the abuse. She did not collect a rape kit because the offenses occurred outside the time frame for collecting any DNA evidence. Dr. Piercy admitted that she could not tell from the examination when the abuse occurred.

**Defendant's Proof**

Beverly Croom, the defendant's aunt, testified that the defendant helped her move the second week of July 2009. She recalled that he helped her the second Friday and Saturday of the month and that he was with her the entire day. On the first day, he arrived between 7:00 and 7:30 a.m. and left between 5:00 and 6:00 p.m. On the second day, he arrived

around 8:00 a.m. and left around 4:00 p.m.

Gloria Herron, the defendant's mother, testified that she saw the defendant "[a]ll the time" in July 2009. She said that he came to her house or she went to his house, generally in the evening. She usually visited the defendant about once a week. She never saw anything out of the ordinary when she was at the defendant's house.

Howard Bernard Croom, the defendant's uncle, testified that, in July 2009, he visited the defendant "[j]ust about every day." He did not observe the defendant ever act oddly around the victim or hurt her in any way.

The thirty-nine-year-old defendant testified that he lived with the victim's mother; her son; her daughter, the victim; and his son, Marquevius, in July 2009. After his unemployment benefits ran out in May, he began searching for a job every morning. According to the defendant, as part of his routine, he took the victim's mother to work, took the children to a babysitter's house, and went to a temporary employment agency to look for a job until noon. Thereafter, he went home and cleaned the house. Every evening, his friends came to his house to socialize. In response to questioning, the defendant elaborated that his uncle came over some mornings after he put in applications for the day. Likewise, some of his friends stopped by after he put in his applications to smoke cigarettes and marijuana. He did not look for a job on Thursdays, Fridays, or Saturdays. The defendant recalled specifically that he helped his aunt move on July 18 and 19, 2009.

The defendant denied raping the victim or having any inappropriate sexual contact with her. He recalled that, when he was confronted by the victim's mother about the allegations, he denied raping the victim. He also recalled that the victim's mother asked him to leave the house. The defendant admitted that Investigator Jones called him to discuss some issues but that she did not tell him that it was concerning child sexual abuse even though he "figured" that was what it was about. He had left Jackson and was in Memphis when Investigator Jones called him. He then went to Michigan to attend a family reunion before returning to Jackson. The defendant claimed that he called Investigator Jones back. The defendant admitted to writing letters to the victim's mother and using the phrase, "Ain't this the best you ever had?" but explained that the phrase was from a song on the radio.

### Rebuttal Proof

Investigator Jones testified that, according to her notes, the defendant told her that "he would come by and then he hung up the phone" and that she did not have any other phone conversations with the defendant.

## ANALYSIS

The defendant argues that the trial court erred in not requiring the State to make an election as to which instances of rape of a child and aggravated sexual battery it was submitting to the jury and that the evidence is insufficient to sustain his convictions because the State offered no evidence that the crimes took place during the dates charged in the indictments.[1] We will address these two issues together because they are interrelated.

The Tennessee Constitution safeguards the right of a criminal defendant to a unanimous jury verdict before a conviction may be imposed. State v. Lemacks, 996 S.W.2d 166, 169-70 (Tenn. 1999). Where the State presents evidence showing that more offenses occurred than are charged, but the indictment is not specific for which offense the defendant is being tried, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. See State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citing State v. Kendrick, 38 S.W.3d 566, 568 (Tenn. 2001); State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). The election requirement "enables the defendant to prepare for the specific charge; it protects a defendant against double jeopardy; it enables the trial judge to review the weight of the evidence in its role as thirteenth juror; and it enables an appellate court to review the legal sufficiency of the evidence." Brown, 992 S.W.2d at 391. Most importantly, the election requirement "safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Johnson, 53 S.W.3d at 631 (citing Brown, 992 S.W.2d at 391).

Recognizing the practical difficulties present in applying the election requirement in cases of child sexual abuse, our supreme court has provided the following guidelines:

> By insisting upon election, we emphasize that the state is not required to identify the particular date of the chosen offense. . . . If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. In fulfilling its obligation under Burlison[ v. State, 501 S.W.2d 801 (Tenn. 1973),] to ensure that an election occurs, the trial court should bear in mind that the purpose of election

---

[1] He does not challenge that the victim's testimony supported the elements of the offenses.

is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask for a conviction, then the court cannot be assured of a unanimous decision.

Shelton, 851 S.W.2d at 137-38 (citations and footnote omitted).

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than

thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2006). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7). "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim [where] . . . [t]he victim is less than thirteen (13) years of age." Id. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6).

At the close of the proof, the trial court mentioned election during discussions concerning the jury charge. The court stated:

> In this particular case, I want to note that the election is not -- as far as TPI, doesn't seem to be necessary in this case because the indictment is very specific as to Counts 1 and 2 occurring within that certain few days and Counts 3 and 4 within a certain few days and Counts 5 and 6 within a certain few days, and this charge is very specific, two separate charges for each of those times. There's not any evidence offered of other crimes for which the Defendant is not on trial for those same dates. So under the law, you would not say the State's got to make an election because there were other -- there's other evidence of other crimes during those dates, so we have to elect this particular crime on this day.

In response, the prosecutor noted that he was going to make an election as to the type of penetration; however, both the prosecutor and defense counsel agreed with the trial court's decision to not instruct the jury on election of offenses based on the proof.

Later, during the State's closing argument, the prosecutor "elected" the particular incidents upon which each charge was based and the time frame in which they had occurred as follows:

> Now, in this case, we've alleged basically three one-week periods, and in each of those one-week periods there's a count of rape of a child and a count of aggravated sexual battery. Okay? Now you've got the schedule and the testimony of those witnesses, and it's been highlighted. Those are the days and times that [the victim's mother] would be working, and those were the days and times that [the victim] would be left in [the defendant's] care, custody and control, okay, and she said this happened about every day, about

-8-

every day.[2]

The first period is July the 1st through July the 4th. The State is relying upon for Count 1, rape of a child, raping her with his penis, and also with the aggravated sexual battery, when he put his mouth -- in her words, licked her middle part. That's Count 1 and Count 2. Counts 3 and 4, rape of a child, the State is relying upon him raping her with his penis during that time. Okay? Aggravated sexual battery for that time is when he would touch her with his hand. Okay? That's what the State's relying upon. Counts 5 and 6, 5 being rape of a child from July the 12th of '09 to July the 18th of '09. The State's relying upon the rape of a child that he raped her with his penis during that time, and during that time, that he placed his mouth on her private part for Count 6, the aggravated sexual battery. That's what the State is relying upon. She told you that it happened all the time. And that's the thing. She can't tell you a specific day, but we know it happened almost every day, and it happened almost every day that the mother went to work.

We conclude that the trial court should have required the State to make an election because the victim's testimony alleged more sexual acts by the defendant than were charged. The indictment alleged, in count one, that the defendant "on or about July 1 through 4, 2009, . . . did intentionally, knowingly, and/or recklessly engage in sexual penetration with [the victim], DOB: 4/7/01, a child less than thirteen (13) years of age, in violation of T.C.A. § 39-13-522[.]" The indictment alleged, in count two, that the defendant "on or about July 1 through 4, 2009, . . . did unlawfully, intentionally, knowingly and/or recklessly engage in sexual contact . . . with [the victim], DOB: 4/7/01, a person less than thirteen (13) years of age, in violation of T.C.A. § 39-13-504[.]" The defendant was charged similarly in counts three and four for incidents occurring "on or about July 5 through 11, 2009," and in counts five and six for incidents occurring "on or about July 12 through 18, 2009."

The victim testified that the incidents started when she was seven years old, happened "a lot," occurred when her mother was at work, and that she was eight years old before she told anyone. When asked whether the incidents happened every day, the victim said, "I don't know." The victim's mother produced her work schedule for July 2009, showing what days she was scheduled to work that month at McDonald's. However, the evidence shows that she was employed at McDonald's the entire two years that the defendant lived with her family, and there was no evidence to pinpoint that the incidents in fact occurred on those dates she worked in July. Dr. Piercy, the forensic examiner, testified

---

[2]We note that the victim never testified that the incidents happened "about every day." She said that it happened "a lot," but she said, "I don't know" when asked if it happened every day.

that the victim told her on July 24 that the defendant's actions most recently occurred a "few days ago" but that does not help focus the jury's attention to any specific incident. Moreover, Dr. Piercy could not tell from her examination when the victim's injuries occurred.

Given the victim's imprecise testimony concerning when the incidents occurred, the jury could have based its decision in the first two counts on incidents possibly happening on any of the three different days the victim's mother worked during that time period, which was the first week of July, 2009. During the second and third time periods, the second and third weeks of July, 2009, she worked five days each period, so different members of the jury could have based their decisions on incidents possibly happening on five different days. There was no proof, either a specific date or descriptive event, offered to differentiate any of the incidents. The victim related that the defendant basically did the same things to her every time and in the same place. She gave no separate identifying information to distinguish any of the incidents; for example, an instance that occurred in another room, an instance where the defendant gave her a lollipop, or an instance that occurred close in time to a holiday or big event. The State attempted to make an election in its closing argument, but the State's "attempt" did nothing to focus the jury's attention to specific incidents in light of the fact the victim's mother worked more than one day in each of the charged time periods. The failure to elect offenses constitutes reversible error.

With regard to the sufficiency of the evidence, the only proof that the incidents occurred during the month of July 2009 was Dr. Piercy's testimony that, when she interviewed the victim on July 24, the victim told her that the last incident occurred a "few days ago." A literal "few days ago" from the day the victim told Dr. Piercy would have been within the time frame the victim was staying with her grandmother and not around the defendant. However, Dr. Piercy further testified that young children often have problems with concepts of time and cannot recall "last week" or certain dates. Therefore, had the State made a proper election of offenses in counts five and six, the last offenses in time, the jury could have conceivably determined that a "few days ago" fell within the time frame alleged in those counts of July 12 through 18. However, with the otherwise complete lack of proof that the incidents happened in the time periods charged, we fail to see any conceivable way the jury could have concluded that the incidents in counts one, two, three, and four occurred in the respective charged time periods. See State v. Johnny Lee Hines, No. 01C01-9709-CC-00405, 1999 WL 33107, at *3-4 (Tenn. Crim. App. Jan. 27, 1999) (indicating that when State elects to describe offenses by particular dates, the offense must be proven to have occurred on that date).

As such, even though the victim's claims of sexual abuse and rape were supported by medical proof, we are constrained to reverse the defendant's convictions in counts one

through four, dismiss those charges, and vacate those sentences. However, with regard to counts five and six, we reverse the defendant's convictions and remand for a new trial on those counts. <u>Cf.</u> <u>State v. Willie Givens</u>, No. M2000-02883-CCA-R3-CD, 2002 WL 1400049, at *12-14 (Tenn. Crim. App. June 28, 2002).

## **<u>CONCLUSION</u>**

Based on the foregoing authorities and reasoning, we reverse and dismiss counts one through four and vacate those sentences, and we reverse and remand counts five and six for a new trial.

_____
ALAN E. GLENN, JUDGE
